# EXHIBIT A

Case 1:18-cv-02526   Document 1-1   Filed 03/21/18   Page 2 of 38

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| Federal Insurance Company, Chubb Indemnity Insurance Company, Vigilant Insurance Company, Pacific Indemnity Company, and Great Northern Insurance Company; | : : : : : |
| Plaintiffs, | : |
| v. | : |
| Harvey Weinstein, | : |
| Defendant. | : : |

Index No.:

**COMPLAINT FOR**
**DECLARATORY JUDGMENT**

Plaintiffs Federal Insurance Company, Chubb Indemnity Insurance Company, Vigilant Insurance Company, Pacific Indemnity Company and Great Northern Insurance Company (hereinafter "Chubb"), by and through their attorneys, CLYDE & CO US LLP and WALKER WILCOX MATOUSEK LLP, allege the following as their Complaint for Declaratory Relief against Defendant Harvey Weinstein ("Weinstein") upon information and belief:

## NATURE OF THE ACTION

1.  Chubb brings this complaint for a declaratory judgment under NY CPLR § 3001 that certain insurance policies it issued to Named Insured Harvey Weinstein do not provide coverage for defense or indemnity for the following eleven sexual assault and sexual harassment lawsuits filed against Weinstein, which are referred to collectively herein as "the Underlying Lawsuits":

   1.  *People of the State of New York v. The Weinstein Company LLC, The Weinstein Company Holdings LLC, Harvey Weinstein and Robert Weinstein,* Supreme Court of the State of New York, New York County;
   2.  *Louisette Geiss, et al. (Class Action) v. Harvey Weinstein, The Weinstein Company Holdings, LLC, et al*., United States District Court for the Southern District of New York, Case No. 17 CV 0954;
   3.  *Kadian Noble v. Harvey Weinstein, The Weinstein Company, LLC, et al.,* United States District Court for the Southern District of New York, Case No. 17 CV 9260;

4. *Sandeep Rehal v. Harvey Weinstein, The Weinstein Company LLC, et al,* United States District Court for the Southern District of New York, Case No. 18 CV 674;

5. *Alexandra Canosa v. The Weinstein Company Holdings, LLC, Harvey Weinstein, et al.,* Supreme Court of the State of New York, County of New York, Index No. 161254/2017;

6. *ABC v. Harvey Weinstein, and The Weinstein Company, LLC, et al.,* High Court of Justice (England), Case No. HQ17-P-04249;

7. *Gregory Ackers v. Harvey Weinstein and The Weinstein Company LLC,* Superior Court of the State of California, for the County of Los Angeles, Case No. BC681850;

8. *Jane Doe v. Harvey Weinstein, et al.*, Ontario (Canada), Case No. CV 17-585459;

9. *Jane Doe I v. Harvey Weinstein, The Weinstein Company Holdings, LLC, et al.*, Superior Court of the State of California, for the County of Los Angeles, Case No BC683411;

10. *Jane Doe II (Class Action) v. Harvey Weinstein, The Weinstein Company Holdings, LLC, et al.*, United States District Court for the Central District of California, Case No. 17 CV 08323; and,

11. *Huett v. The Weinstein Company, LLC,* Superior Court of the State of California, for the County of Los Angeles, Case No. BC680869.

2.     This action has a substantial nexus to the State of New York in that eighty insurance policies involved in this action were issued to Mr. Weinstein in New York, by a New York insurance company, to the Named Insured Mr. Weinstein and his family members at a New York address, and were delivered in New York, utilizing the services of a New York agent, where payment of the premiums also occurred in New York.

3.     Moreover, upon information and belief, Harvey Weinstein is a resident of the State of New York and maintains at least one home in New York. In addition, Mr. Weinstein regularly transacted business, for at least the past twelve years and at all times mentioned herein, in the State of New York, in his role as the co-founder, co-Chairman and co-CEO of The Weinstein Company ("TWC") from its inception in or about 2005 until his termination in October 2017 and TWC maintained its principal office and place of business at 99 Hudson Street, New York, New York.

2

4.      Finally, and significantly, much of the conduct at issue in the Underlying Lawsuits occurred in the State of New York and resulted in the filing of five of the Underlying Lawsuits in New York, one of which was initiated by the Attorney General of the State of New York to pursue Harvey Weinstein and others for sexual assault and harassment which constituted egregious and repeated violations of New York law.

5.      As alleged by the New York Attorney General and the other plaintiffs, the Underlying Lawsuits arise out of a pattern of intentional, egregious sexual predatory behavior by Harvey Weinstein which included rape, flashing, groping, fondling, harassing, battering, and other sexual assault, all for his own personal sexual gratification, which spanned at least the past thirty years.

6.      Specifically, the allegations of the Underlying Lawsuits are that Weinstein and multiple "complicit" individuals and companies conspired to lure women into vulnerable situations, under the guise of career advancement, so that Weinstein could rape, sexually assault or harass them, and then later silence any accusations of wrongdoing. To accomplish the goal of secrecy, it is alleged that Mr. Weinstein entered into confidential settlements with at least eight victims, all of which included strict nondisclosure agreements. It is also alleged that Mr. Weinstein threatened myriad other victims that they would be blacklisted in the entertainment industry if they disclosed the sexual assaults.

7.      The alleged victims include not only the plaintiffs in the Underlying Lawsuits, but also over a hundred other women.

8.      Chubb seeks a declaratory judgment, among other things, that coverage for the Underlying Lawsuits does not attach under the policies based on the application of certain policy

3

Case 1:18-cv-02526   Document 1-1   Filed 03/21/18   Page 5 of 38

terms, conditions and exclusions and therefore Chubb has no obligation under any of the policies identified herein to defend or indemnify Harvey Weinstein in the Underlying Lawsuits.

## **PARTIES**

9.      Plaintiff Federal Insurance Company is an Indiana corporation with its principal place of business located in New Jersey, which issued policies in New York to Harvey Weinstein at his New York address.

10.     Plaintiff Chubb Indemnity Insurance Company, is a New York corporation with its principal place of business located in New Jersey, which issued policies in New York to Harvey Weinstein at his New York address.

11.     Plaintiff Great Northern Insurance Company is an Indiana corporation which was previously incorporated in Minnesota, with its principal place of business located in New Jersey, which issued policies in New York and New Jersey to Harvey Weinstein at his New York and New Jersey addresses.

12.     Plaintiff Vigilant Insurance Company, is a New York corporation with its principal place of business located in New Jersey.

13.     Plaintiff Pacific Indemnity Company, is a Wisconsin corporation with its principal place of business located in New Jersey.

14.     The Plaintiffs are and/or were licensed to transact business in the State of New York.

15.     Upon information and belief, Defendant Harvey Weinstein is a resident of New York, New York. Defendant Weinstein is also the co-founder, and was the co-Chairman and co-

Case 1:18-cv-02526   Document 1-1   Filed 03/21/18   Page 6 of 38

CEO of TWC from its inception in or about 2005 until his termination in October 2017. TWC

maintained its principal office and place of business at 99 Hudson Street, New York, New York,

10013, from which the company and Weinstein regularly transacted business at all times

mentioned herein.

### JURISDICTION AND VENUE

16.     Jurisdiction exists over the Defendant pursuant to Section 301 or Section

302(a)(1) of the Civil Practice Law and Rules.

17.     Venue is proper in New York County pursuant to Section 503(a) and (c) of the

Civil Practice Law and Rules as Defendant resides and transacts business in New York County.

### THE INSURANCE POLICIES

18.     Chubb issued a number of insurance policies to the Named Insured, Harvey

Weinstein and/or members of his family, which provided multiple coverages including

homeowners' property, fine arts, auto and personal liability, on a primary and excess basis, with

varying limits and terms.

19.     Chubb's policies included both primary and excess level policies, each written for

annual policy periods during the time period between 1994 to 2018.  Specifically, the policies

issued by Chubb that are at issue in this Complaint are listed on Appendix A.

20.     The personal liability section of the policies generally provides coverage for

"damages a covered person is legally obligated to pay for personal injury or property damage

which take place anytime during the policy period and are caused by an occurrence, unless stated

otherwise or an exclusion applies."

21.     The personal liability section of certain of the policies define "occurrence" either

as an "accident" or as "an accident or offense."

5

22.     The personal liability section of all of the policies includes a section captioned "Defense coverages" pursuant to which Chubb agreed to "defend a covered person against any suit seeking covered damages for personal injury or property damage."

23.     The personal liability section of all of the policies includes an "Intentional acts" exclusion substantially similar to the following:

> **Intentional acts**. We do not cover any damages arising out of a willful, malicious, fraudulent or dishonest act or any act intended by any covered person to cause personal injury or property damage. But we do cover such damages if the act was intended to protect people or property unless another exclusion applies. An intentional act is one whose consequences could have been foreseen by a reasonable person.

24.     The personal liability section of all of the policies includes a "Director's liability" exclusion substantially similar to the following:

> **Director's liability**. We do not cover any damages for any covered person's actions or failure to act as an officer or member of a board of directors of any corporation or organization.…

25.     The personal liability section of all of the policies includes a "Business pursuits" exclusion substantially similar to the following:

> **Business pursuits**. We do not cover any damages arising out of a covered person's business pursuits, investment or other for-profit-activities, any of which are conducted on behalf of a covered person or others, or business property.…

26.     Certain of the policies contain an exclusion regarding sexual assault substantially similar to the following:

> **Molestation, misconduct or abuse**. We do not cover any damages arising out of any actual, alleged or threatened:
> • sexual molestation;
> • sexual misconduct or harassment; or
> • abuse.

27.     The personal liability section of all of the policies includes a "Discrimination" exclusion substantially similar to the following:

6

**Discrimination**. We do not cover any damages arising out of discrimination due to age, race, color, sex, creed, national origin, sexual harassment, or any other discrimination.

## THE UNDERLYING LAWSUITS

## New York Attorney General Lawsuit, New York County, New York

28.    On February 11, 2018, New York Attorney General Eric Schneiderman filed a lawsuit in the Supreme Court of the State of New York, New York County, naming as defendants Harvey Weinstein and others.  The Attorney General alleged multiple violations of New York Human Rights and New York Civil Rights laws, including Mr. Weinstein's decades-long history of  "engaging in unlawful sex offenses, such as sexual misconduct, forcible touching, and coercion, and attempts to commit the same…"

29.    The stated purpose of the suit is:

> to remedy a years-long gender-based hostile work environment, a pattern of quid pro quo sexual harassment, and routine misuse of corporate resources for unlawful ends that extended from in or about 2005 though at least in or about October 2017.  The Attorney General seeks to hold accountable Harvey Weinstein ("HW"), his brother Robert Weinstein ("RW"), and the company for which they served as co-owners, co-Chairmen of the Board, and co-Chief Executive Officers ("co-CEOs"), The Weinstein Company LLC and its parent holding company The Weinstein Company Holdings LLC, … for repeated, persistent, and egregious violations of law, to vindicate the rights of TWC employees, and to prevent future recurrence of such misconduct.

30.    The Attorney General alleged that the unlawful conduct took two primary forms:

> i.    First, HW [Harvey Weinstein] as co-CEO of TWC, repeatedly and persistently sexually harassed female employees at TWC by personally creating a hostile work environment that pervaded the workplace and by demanding that women engage in sexual or demeaning conduct as a quid pro quo for continued employment or career advancement. Some of HW's sexual harassment involved unlawful sexual contact.
> ii.    Second, HW repeatedly and persistently used his position at TWC, female employees at TWC, and the resources at his disposal as a co-CEO of TWC, to serve his interests in sexual contact, some of which upon information and belief was unlawful in nature, with women seeking employment or business opportunities with TWC.

8

FILED: NEW YORK COUNTY CLERK 02/28/2018 03:29 PM

NYSCEF DOC. NO. 2    Case 1:18-cv-02526    Document 1-1    Filed 03/21/18    Page 10 of 38    INDEX NO. 650952/2018    RECEIVED NYSCEF: 02/28/2018

31.   The complaint accuses the defendants of pervasive and egregious sexual harassment which created a hostile work environment by intimidating and demeaning female employees and by other vicious and exploitive treatment of employees.   With regard to the company, the lawsuit alleges that it failed to adequately inquire into or to restrain or prevent the repeated and persistent unlawful conduct occurring at the company and thereby effectively enabled Harvey Weinstein to continue victimizing employees of the company.

32.   The complaint alleges:

HW repeatedly and persistently misused his power within TWC and in the film and television industry, and the employees and resources of TWC, to harm and exploit both TWC workers and third parties seeking to do business with TWC. Within TWC, HW wielded this power in a sexually discriminatory manner.

HW personally created and perpetuated a work environment permeated with gender-based hostility and inequality. As described in Sections A and B below, HW engaged in quid pro quo sexual harassment; subjected female TWC employees and women seeking business or job opportunities with TWC to unwelcome and inappropriate physical contact and touching; subjected employees to a persistent stream of threats and verbal abuse, much of which was sexual or gendered in nature; and menaced female employees with threats to their careers and of physical harm.

33.   The complaint alleges that Weinstein's assistants were required to "facilitate his sex encounters" as a condition of employment and he badgered women who refused or expressed reluctance.

34.   Weinstein also allegedly subjected employees to threats, such as "I will kill you, I will kill your family," and made offers or demands for sexual favors in exchange for career advancement at the company.

35.   The complaint alleges that Harvey Weinstein committed "these unlawful acts in his capacity as TWC's co-owner and co-CEO, making him the most senior person in the company.   In that role, [Harvey Weinstein] used TWC's corporate resources and employees to

9

facilitate the unlawful conduct. Thus, as a matter of law, [Harvey's] unlawful activities are attributable to TWC."

36.      The complaint asserts causes of action for violations of the New York State Human Rights Laws for quid pro quo sexual harassment, hostile work environment, and unequal treatment, denial of Equal Protection under the New York Civil Rights Law, persistent and repeated illegal business conducts and seeks a permanent injunction, a civil penalty of $100,000/$250,000 per each violation of the New York Human Rights Law, restitution, an unspecified amount in compensatory damages, and other remedial relief.

## Geiss Putative Class Action v. Harvey Weinstein, et al, Southern District of New York

37.      On December 6, 2017, six women, on behalf of themselves and a putative class of similarly situated individuals, filed suit against Harvey Weinstein and others, alleging that "[u]nder the guise of meetings ostensibly to help further Plaintiffs' careers, or to hire them, or to socialize at industry events, Weinstein isolated Plaintiffs and Class Members in an attempt to engage in unwanted sexual conduct that took many forms: flashing, groping, fondling, harassing, battering, false imprisonment, sexual assault, attempted rape and/or completed rape."

38.      The plaintiffs further allege that:

> Plaintiffs and Members of the Class had or wanted to have careers in the entertainment industry and correctly understood that Weinstein was a powerful force in the production world. At all times, Plaintiffs and the Class operated under duress and the credible and objective threat of being blacklisted by Weinstein and major film producers such as Miramax and TWC if they refused Weinstein's unwanted sexual advances or complained about his behavior. To the extent a woman was "lucky" enough to escape physically unscathed, Weinstein's behavior (and the fact it was facilitated by TWC and Miramax, the "Complicit Producers") nonetheless caused injury to their business prospects, career, reputation, and severe emotional and physical distress.

39.     The plaintiffs seek class-action status to represent the "dozens, if not hundreds" of women who say Weinstein harassed or assaulted them.

40.     The suit alleges that Weinstein and his co-conspirators lured victims to hotel rooms, office casting couches, or Weinstein's homes under the pretense of professional development opportunities, when Weinstein would then pursue unwanted and forcible sexual conduct.

41.     The complaint includes these allegations as to Ms. Geiss:

> Weinstein emerged from the bathroom in an open bathrobe, naked underneath. He informed Geiss that he would listen to the remainder of her pitch from the hot tub. He then disrobed, entered into the hot tub and began to masturbate. His demeanor had changed from professional and helpful to belligerent and overbearing. He told her to keep talking while he masturbated.

> Distressed, Geiss began to leave the room. Weinstein quickly climbed out of the hot tub and grabbed her arm. He pulled her to his bathroom, insisting she watch him masturbate. He told her he would "greenlight" her script if she watched him masturbate. Louise repeatedly said no. She felt violently ill and distressed.

> Continuing to hold on to her arm, Weinstein told Geiss that he would introduce her to his brother, Bob, and she could act in films through Dimension Films, a TWC subsidiary, if she watched him masturbate. She said no. He then offered her a three-film deal as an actress to stay. She said no. Fearing an imminent sexual assault, Geiss escaped Weinstein's grasp and fled, with Weinstein giving chase.

42.     The complaint included these allegations as to Ms. Kendall:

> Weinstein repeatedly requested a massage, and Kendall refused. Weinstein told Kendall that "everyone does it," claiming that specific actresses "did it all the time" and asking why Kendall was making "a big deal" out of the situation. Kendall again refused, informed Weinstein [sic] that he was making her very uncomfortable. She was visibly upset, shaking and on the verge of tears.

> Weinstein then went back to the bathroom; when he returned, he was naked. She felt an immediate "fight or flight" response, with a burst of adrenaline and fear. He then stood between Kendall and the door, informing Kendall that her refusal to provide sexual services had

11

"insulted" him. Weinstein chased Kendall around the apartment, demanding that she kiss him, that she touch him, and that she allow him to see her breasts.

Weinstein barred Kendall in the apartment, placing her in imminent fear for her life and her safety. She believed that she was about to be raped.

After a distressing amount of time, Weinstein finally agreed to allow Kendall to leave if she would allow him to accompany her to a taxicab.

43.    The complaint includes these allegations as to Ms. Brock:

Weinstein then left the room, re-emerging in the nude and demanding a massage. When Brock refused, Weinstein asked if she would like a massage instead, and physically maneuvered her into his bedroom.

Brock took note of the room's thick walls and realized that nobody was likely to hear her if she were to cry out. Moreover, she had observed the hotel staff attempting to ingratiate themselves to Weinstein when they had arrived. Finally, she realized that Weinstein's associates had lied about their intentions in order to convince her to come to the hotel in the first place. She was terrified that Weinstein was going to rape her, and she feared for her life.

Brock was able to elude Weinstein's grasp and escape to the bathroom, where she locked herself in. The bathroom did not have a telephone that would have allowed her to call for help. Weinstein then began to bang on the bathroom door and demand that Brock come out. Convinced that he would rape her, Brock refused.

Eventually, after Brock started yelling, Weinstein promised to put his clothes on.

When Brock emerged from the bathroom, Weinstein was in a bathrobe.

44.    The complaint includes these allegations as to Ms. Sagemiller:

Sagemiller went to Weinstein's room at the scheduled time. Weinstein answered the door in his robe. He had poured drinks.

Weinstein asked Sagemiller if she would give him a massage, and then he demanded a kiss. In response to her refusal, Weinstein responded that he would not allow her to leave until she kissed and touched him. He blocked the door, placing Sagemiller in fear of an impending assault.

12

Weinstein then told Sagemiller that Renée Zellweger, Charlize Theron and other actresses gave sexual favors. Weinstein asked her, "Don't you want your career to be more than just this little teen film?"

Weinstein continued to prevent Sagemiller from leaving. In an effort to be permitted to depart, Sagemiller finally submitted to a forcible kiss. Weinstein then said, "OK, you can go now. That's all I wanted. Just do what I say and you can get your way." She was then permitted to leave.

45.   The complaint includes these allegations as to Ms. Thomas:

Thomas drove to Weinstein's home. When she arrived, Weinstein opened the door in his boxer shorts and an undershirt. Thomas assumed Weinstein had forgotten about the interview, and that he would excuse himself to go change. But he did not.

Weinstein then proceeded to conduct the "interview" in his underwear. The intimidation engendered by Weinstein's industry power was multiplied by his strange behavior. Weinstein's behavior made Thomas very uncomfortable.  Eventually, leaning forward and wiggling his eyebrows as if leering at her, Weinstein asked whether she would "flirt" with his friends to "get ahead." Thomas was disgusted and uncomfortable.

At the conclusion of the interview, still clad only in his underclothes, Weinstein grabbed Thomas and pulled her tight against his body. The hug was uncomfortably close, and lasted too long. She did not know how to get out of his embrace. Weinstein then told Thomas that he loved her. Thomas felt unsafe and sexualized. She was afraid to try and pull away or push him off or even ask him to stop because she feared he may become violent.

Thomas left feeling upset, shaken, afraid and disrespected.

46.   The complaint includes these allegations as to Ms. Klatt:

He asked her to disrobe and explained he needed to see her breasts, repeatedly stating, "It's just your breasts." When Klatt refused repeatedly, Weinstein told her to "take your dress down" and "you are going to need to expose them." Weinstein told Klatt that the role required him to review and approve of her breasts. Klatt, realizing she was about to be sexually assaulted, was terrified.

When Klatt continued to refuse, Weinstein angrily inquired whether she knew who he was, told her he could "make" her or "break" her, and that she would "never work in this town again." "You know, I could launch

your career and I can make you or I can break you," he insisted, again demanding that she expose her breasts.

Weinstein then told Klatt to show herself out and advised her she could not use the main door. He corralled her to a side door that led into a pitch-black stairwell. He then locked the door behind her.

47.    The complaint alleges that Weinstein and the other defendants engaged in a pattern of "isolating and blacklisting" victims to cover up Weinstein's "predatory tactics."

48.    The *Geiss* complaint asserts fourteen counts, as follows: RICO violations, negligent supervision and retention, civil battery, assault, intentional and negligent infliction of emotional distress, and ratification.

## Noble v. Harvey Weinstein, et al, Southern District of New York

49.    This lawsuit was filed by Kadian Noble on November 27, 2017 and claims damages under the Federal sex trafficking statute 18 U.S.C. §§ 1591 and 1595 arising from Harvey Weinstein's sexual assault of Noble, a young aspiring actress, in Cannes, France in 2014.

50.    The complaint alleges that Weinstein lured Noble to his hotel room with a promise that they would discuss how he could assist her with her acting career.  Once she arrived, the lawsuit alleges that Weinstein physically detained Noble and eventually sexually assaulted her.

51.    Specifically, the introductory paragraph of the complaint alleges that Mr. Weinstein "recruited and enticed a young aspiring actress, Plaintiff KADIAN NOBLE [sic], with the promise of a film role, knowing that he would use means of force, fraud or coercion to cause her to engage in a sex act in his hotel room."

52.    The complaint further alleges that Mr. Weinstein "forcibly pulled KADIAN [sic] into the bathroom. He told KADIAN to relax while he gripped her firmly. HARVEY WEINSTEIN [sic]  then started to rub KADIAN's breast and buttocks. KADIAN told him to stop and attempted to leave the bathroom, but HARVEY WEINSTEIN blocked her exit."

14

53.     The complaint goes on to allege that Mr. Weinstein "pulled down KADIAN's shirt, revealing her breasts, and unbuckled his pants and belt. Once again, KADIAN pleaded with him to stop. HARVEY WEINSTEIN then forced his leg between KADIAN's legs, began rubbing her vagina, and then took his penis out and began masturbating. In a panic, KADIAN again implored him to stop, and struggled against him physically, trying to escape the bathroom. HARVEY WEINSTEIN then forcefully grabbed KADIAN's hand, placed it on his penis, and forced her hand to masturbate him. HARVEY WEINSTEIN used his other hand to control KADIAN and defeat her resistance."

54.     The complaint alleges that Noble "suffered severe injuries and emotional distress, pain and suffering, mental anguish…" and "suffered an aggravation of an existing condition or activation of a latent condition and resulting damages."

55.     The complaint includes causes of action for violation of 18 U.S.C. §§ 1591 against Harvey Weinstein.

56.     The complaint alleges that Noble "suffered severe injuries and emotional distress, pain and suffering, mental anguish…" and "suffered an aggravation of an existing condition or activation of a latent condition and resulting damages."

## Sandeep Rehal v. Harvey Weinstein, et al, Southern District of New York

57.     Ms. Rehal filed a lawsuit on January 25, 2018 in the United States District Court for the Southern District of New York naming as defendants Harvey Weinstein and others and seeking redress under the New York City Human Rights Law and the Administrative Code of the City of New York.

58.     Sandeep Rehal was a personal assistant to Harvey Weinstein in TWC's New York City office from approximately February 2013 to February 13, 2015.

15

59.     Ms. Rehal alleges that she "was forced to work in a pervasive and severe sexually hostile work environment at TWC and The Weinstein Company Holdings LLC … defined by endless offensive, degrading, and sexually harassing actions, statements, and touching at the hands of her boss, Harvey Weinstein."

60.     Her allegations include:

14.     As Ms. Rehal soon learned, Harvey Weinstein's assistants were expected to be available at all times; there was no boundary between Harvey Weinstein's work life and personal life. Much of Ms. Rehal's work as an employee of TWC involved catering to Harvey Weinstein's sexual appetites and activities, and catering to his demeaning and often abusive family members.
***

16.     Ms. Rehal was required to be involved in and aware of the preparations for, and clean up after, Harvey Weinstein's extremely prolific sexual encounters.

17.     Throughout her employment with Defendants Ms. Rehal was required, as a condition of her employment, to work with Harvey Weinstein when he was naked. On an almost weekly basis, she was required to take dictation of emails from him while he was naked.

18.     Harvey Weinstein subjected Mr. Rehal to unwelcome touching. Almost every time Ms. Rehal accompanied Harvey Weinstein in his chauffeured Lexus SUV, he made her sit in the back with him and touched her thigh. After Ms. Rehal started wearing pants instead of skirts, Harvey Weinstein would rub between her thighs. When Ms. Rehal sat cross legged in an attempt to prevent him from being able to touch her thigh, Harvey Weinstein would touch the back of her legs and butt.

19.     When Harvey Weinstein followed Ms. Rehal out to the chauffeured Lexus SUV, he frequently would walk very close to her so that his large belly would touch her. When Ms. Rehal attempted to move away he came even closer and pressed himself against her.

20.     Ms. Rehal was also subjected to other extremely offensive physical contact, which should never occur in the work environment and to which she would not have been subjected but for Harvey Weinstein's depraved abuses of power, that were aided and abetted for years by Defendants' acts and omissions.

21.     Harvey Weinstein used sexist and sexual language to refer to Ms. Rehal, regularly referring to her as "cunt" or "pussy." On numerous occasions he

16

said, "What's wrong Sandeep, is the tampon up too far today?" His offensive sexist comments about and to Ms. Rehal were constant and were made openly in the presence of other employees of TWC.

22.    Harvey Weinstein repeatedly made remarks to Ms. Rehal about her appearance, and her clothes. Harvey Weinstein told Ms. Rehal she looked good and leered at her. When in a futile attempt to minimize Harvey Weinstein's comments about her appearance, Ms. Rehal started wearing pants, Harvey Weinstein complained to her "you used to dress so cute and now what's going on?"

23.    Harvey Weinstein repeatedly emphasized his absolute power to Ms. Rehal and others. He constantly bragged about his power, stating to Ms. Rehal and other employees, "I am Harvey Weinstein and you are at Weinstein University. I decide whether or not you graduate."

***

25.    Harvey Weinstein also ordered Ms. Rehal to obtain and set up an apartment close to the office for him to use with one of his sexual liaisons, and purchase women's lingerie for the woman in that apartment as well as gifts for other women.

26.    In addition to maintaining his list of available women, Ms. Rehal was forced to do many other offensive chores to "assist" in Harvey Weinstein's sex life. She was required to manage the stock of Caverject shots for his erectile dysfunction. She had to obtain the shots and keep them stocked in cabinet behind her desk at Harvey Weinstein's TWC office. Every time Harvey Weinstein went to meet a woman at a hotel, in the office, or elsewhere, which occurred on average at least three times a week when he was in New York, Ms. Rehal was required as part of her job to provide Harvey Weinstein with a shot, which she placed in his jacket pocket or in a brown paper bag.

27.    At one point in Ms. Rehal's employment, the Caverject shots were no longer available from the London doctor who had been prescribing them. Harvey Weinstein ordered Ms. Rehal to find a supply in the United States and gave her a bonus of $500 paid by TWC for doing so. Frank Gil, knowing that the bonus was for Ms. Rehal's procurement of erectile dysfunction drugs, authorized the payment.

28.    Another "task" Ms. Rehal was forced to do to aid Harvey Weinstein's sexual encounters was to clean up the semen on the couch in Harvey Weinstein's office. This happened on a regular basis, three or so times a week when Harvey Weinstein was in New York.

61.    Ms. Rehal asserts two causes of action: discrimination and harassment in violation of the New York Human Rights Laws and aiding and abetting violations of the New York Human Rights Laws.

## Alexandra Canosa v. Harvey Weinstein, et al., New York County, New York

62.    On December 20, 2017, Alexandra Canosa filed suit against Harvey Weinstein and others in New York state court, by filing only a Summons with Notice of Commencement of Action.

63.    Ms. Canosa alleges that Harvey Weinstein threatened her and "made it clear that if she did not succumb to his demands or if she exposed his unwanted conduct there would be retaliation, including humiliation, the loss of her job and any ability to work in the entertainment business."

64.    Ms. Canosa alleges sexual harassment, sexual assault, sexual intimidation, emotional abuse and assault and battery over "a period of years through 2017."

65.    As against Harvey Weinstein, Ms. Canosa asserts causes of action for sexual harassment, quid pro quo and violation of the New York City Human Rights Laws, sexual assault and battery, and intentional infliction of emotional distress. She seeks an unspecified amount in "monetary damages, punitive and exemplary damages, and attorney's fees and costs …. estimated to be in excess of 10 million dollars."

## ABC v. Harvey Weinstein, et al., High Court of Justice (England)

66.    On or about November 23, 2017, anonymous plaintiff ABC filed a claim in the High Court of Justice, London, England, Queen's Bench Division, bearing Case No. HQ17-P-04249, and naming as defendants Harvey Weinstein, TWC, and others.

18

67.    The plaintiff recently filed a statement of "Particulars of Claim." The Particulars of Claim states that "This claim relates to allegations that the Claimant suffered personal injury by way of physical and/or psychiatric injury as a result of sexual assaults and emotional abuse by Harvey Weinstein whilst she was working for him …"

68.    ABC asserts that "the assaults and the psychiatric damage caused to the Claimant were caused by the intentional assault" of Harvey Weinstein.

69.    The Particulars of Claim disclosed the following details regarding the sexual assaults by Harvey Weinstein:

(a)    Being required by an assistant from New York who was employed by the First and/or Second Defendant to visit Harvey Weinstein's bedroom at a London Hotel to pack his clothes and check his documents at a time when he was in his bedroom. When the Claimant attended as instructed Harvey Weinstein proceeded to invite the Claimant into the shower with him and when she refused to enter the shower Harvey Weinstein stood naked in front of the Claimant and proceeded to masturbate to ejaculation in her presence.

(b)    Being required by the First and/or Second Defendant to meet Harvey Weinstein on his return to London at Heathrow airport and to accompany him to a hotel. On complying with these instructions when the Claimant attended the hotel Harvey Weinstein removed his clothes and sexually assaulted the Claimant as detailed in the report of Dr Mark Salter contained in a sealed envelope on the Court file.

(c)    The First and/or Second Defendant arranging for the Claimant to stay in a Hotel in the USA that was known to Harvey Weinstein and where he sexually assaulted her whilst she resisted and pushed him away, as detailed in the report of Dr Mark Salter contained in a sealed envelope on the Court file.

(d)    Being required by the First and/or Second Defendant to accompany Harvey Weinstein to and from meetings in London during which he repeatedly pressured her for sex. At one point during this visit he then took her to a hotel room where he sexually assaulted her, details of the sexual assaults are contained in the report of Dr Mark Salter contained in a sealed envelope on the Court file.

19

FILED: NEW YORK COUNTY CLERK 02/28/2018 03:29 PM
NYSCEF DOC. NO. 2    Case 1:18-cv-02526   Document 1-1   Filed 03/21/18   Page 21 of 38   RECEIVED NYSCEF: 02/28/2018

INDEX NO. 650952/2018

(e)     The First and/or Second Defendant arranging for the Claimant to accompany Harvey Weinstein in a European city where he came to her room and sexually assaulted her details of the sexual assaults are contained in the report of Dr Mark Salter contained in a sealed envelope on the Court file.

70.     ABC asserts a tort cause of action against Harvey Weinstein, as follows: ABC "alleges that the Third Defendant [Harvey Weinstein] intentionally sexually assaulted her on a number of occasions, and in a number of locations, though primarily in London, England. As a result of these sexual assaults the Claimant has suffered damage, including the direct injury of the sexual assaults themselves, as well as psychiatric injury and economic loss as a result of the assaults."

### Gregory Ackers v. Harvey Weinstein and TWC, Los Angeles County, California

71.     On November 2, 2017, Gregory Ackers filed suit, without assistance of counsel, against Harvey Weinstein and TWC in California state court in Los Angeles.

72.     Ackers asserted causes of action for sexual assault, negligence and unjust enrichment, alleging that he was an aspiring film director preparing to negotiate terms for the production of a feature film project with Weinstein in 2007.

73.     Ackers contends that, on November 2, 2007, Mr. Weinstein lured him to his car which was parked in an underground parking garage and that Mr. Weinstein sexually assaulted, molested and attempted to rape Mr. Ackers in the car.

74.     Specifically, Mr. Ackers alleges as follows:

"Pltf [sic] was an aspiring film director preparing to negotiate terms for the production of a feature film project that Pltf Ackers & Dft [sic] Weinstein had arranged in the nearby Santa Monica Lowes Hotel earlier that day. These activities occurred during the American Film Market, which goes on annually during November. Pltf Ackers & Dft Weinstein met, in the restaurant, as planned, on aforementioned evening.

20

After 10:PM,Ackers & Weinstein met & discussed a proposed production deal on a proposed feature. Dft Weinstein invited Pltf Ackers to speak & negotiate further in Weinsteins [sic] car ,which Weinstein claimed, was parked in the downstairs garage. Weinstein & Ackers exited the restaurant & went down stairs to the garage area ,where not many cars were parked. The garage was devoid of any other people.

Weinstein proceed to physically assault Ackers by grabbing his shoulders & attempting to force the Pltfs down to the Dfts crotch/private area. The Pltf attempted resistance, but the larger, stronger Dft was able to manhandle the Pltfs face onto his genital area. Weinstein fumbled to open his trousers & was noticed by Pltf to ejaculate, during the harried encounter."

## Jane Doe v. Harvey Weinstein, et al, Ontario, Canada

75.     On October 31, 2017, an anonymous "Jane Doe" filed suit in Ontario for two alleged sexual assaults by Weinstein that occurred in Toronto in 2000.  The suit names as defendants Harvey Weinstein, Miramax, The Walt Disney Company, and Barbara Schneeweiss.

76.     The suit alleges that plaintiff Doe secured a small part in a movie being filmed in Toronto in 2000.  Weinstein asked her to attend a meeting at his hotel in Toronto.  Once they were alone, Weinstein asked Doe for a massage and, when she rebuffed him, he forced her onto the bed, held her down and sexually assaulted her.

77.     The specific allegations of the Complaint include that "Weinstein, who was substantially larger, assaulted Doe. He overpowered her, pushed her onto the bed, and took his penis out of his pants. After exposing his penis, he told Doe that he had made various famous actresses' careers and could make Doe's career as well….He then gestured and looked at his penis. He forced down her skirt and held her down by her wrists. Doe said 'no' either two or three times. Weinstein persisted in his assault. Doe tried to, but could not, resist the assault.

21

Weinstein held Doe down and forcibly performed oral sex on her without her consent." The Complaint also alleged that Weinstein "threw his weight onto her and tried to stick his tongue down her throat."

78.     Doe alleges sexual battery, intentional infliction of emotional distress, civil conspiracy, bodily injury, loss of enjoyment of life and loss of career advancement.

### **Jane Doe Putative Class Action, Central District of California**

79.     On November 15, 2017, Jane Doe filed suit on behalf of herself and a putative class of similarly situated individuals against Harvey Weinstein and others in the United States District Court for the Central District of California, asserting eight counts, including RICO, assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress.

80.     Plaintiff alleges that she and members of the class sought careers in the film and/or TV industry and understood that Weinstein was a powerful force in the industry. Plaintiff asserts that she and the class operated under duress and the threat of being blacklisted by Weinstein and major film producers if they refused Weinstein's unwanted sexual advances or complained about his behavior.

81.     The class representative, Jane Doe 1, alleges as follows:

29.     While at an audition on the first floor of a building also occupied by Miramax, an associate of Weinstein's invited Jane Doe 1 to meet Weinstein in his private office on another floor, because he was reportedly casting a film and was looking for an actress who had her "look". The meeting was timed for the end of the workday. Jane Doe 1 shook hands, provided her headshot and resume to Weinstein and engaged in cordial pleasantries and polite conversation. Weinstein then asked her to read from a script, explaining that he was looking for a new face with a "very European look." Jane Doe 1 and Weinstein then read from three pages of the untitled script; she read a few more pages with him upon his request. Weinstein appeared very happy and pleased and told her he had several other projects she might "be right for." He told Jane Doe 1 that she was "exactly what I am looking for" and that she had

gotten the part and told her to take the script home to study. Jane Doe 1 placed the script in her briefcase and prepared to leave. Weinstein then told her he "just needed one more thing from you." He asked her to disrobe and explained he needed to see her breasts, repeatedly stating, "It's just your breasts." When Jane Doe 1 refused repeatedly, Weinstein told her to "take your dress down" and "you are going to need to expose them." Weinstein told Jane Doe 1 that the role required him to review and approve of her breasts. Jane Doe 1, realizing she was about to be sexually assaulted, was terrified.

30.   When Jane Doe 1 continued to refuse, Weinstein angrily inquired whether she knew who he was, told her he could "make" her or "break" her, and that she would "never work in this town again." "You know, I could launch your career and I can make you or I can break you," he insisted, again demanding that she expose her breasts. Weinstein then told Jane Doe 1 to "Give me my script back." Weinstein was belligerent and ranting. He told her, "Without me, you will never work again."

82.   Plaintiff alleges that Weinstein's assault was a part of his pattern of predatory behavior designed for his personal gratification at the expense of Plaintiff and the Class.

83.   Doe alleges causes of action against Weinstein for civil battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress and violations of RICO.

## Jane Doe v. Harvey Weinstein, et al, Los Angeles County, CA

84.   This lawsuit was filed on behalf of Jane Doe on November 14, 2017, and asserts causes of action for statutory violations for sexual battery and gender violence, and common law claims of assault, battery, negligence, negligent retention or supervision and injunctive relief.

85.   Plaintiff asserts that in late 2015, she met Weinstein at the Montage Hotel in Beverly Hills to discuss a prospective acting job on a television show. Weinstein sexually assaulted her.  She also alleges that Weinstein raped her in 2016 during a meeting at the same hotel to discuss her role on the same television show.

86.   Doe's specific allegations include the following:

In late 2015, Plaintiff met Weinstein at the Montage Hotel in Beverly Hills, California to discuss a prospective acting job on a television show called

"Marco Polo" as well as acting in two to three other projects. At some point, he said he wanted to masturbate in front of her. Plaintiff told Weinstein that she did not want him to masturbate in front of her. Weinstein told her that he would not touch her, but "only" wanted her to watch him. Despite her telling Weinstein "no," Weinstein proceeded to grip her wrist with one hand while using the other to masturbate in front of her until completion.

In early spring of 2016, Weinstein contacted Plaintiff again to meet with him at the Montage Hotel in Beverly Hills to celebrate her upcoming role in Marco Polo giving her the impression that she had been chosen for the part. Plaintiff agreed. At some point, Weinstein excused himself and returned wearing a bathrobe. Before Plaintiff could leave, Weinstein grabbed her and pulled her into the bedroom. Plaintiff told Weinstein that she did not want to do anything sexual with him. He forcefully threw Plaintiff onto the bed. He pulled down her jeans and started to orally copulate her. Plaintiff pushed Weinstein's head off of her and told him, "Stop!" Weinstein then used his massive weight and strength to force himself on her, pushing his penis inside of her vagina without a condom. After he withdrew, he gripped her with one hand while using his other hand to masturbate. Plaintiff finally broke free from his grasp and immediately left the bedroom and suite.

87.    Plaintiff alleges she suffered physical injury, severe emotional distress, humiliation, embarrassment and economic harm and is entitled to an unspecified amount in compensatory and punitive damages. Doe alleges causes of action against Weinstein for sexual battery, gender violence, battery, assault, and negligence.

## **Huett v. Harvey Weinstein, et al, Los Angeles County, California**

88.    On October 24, 2017, Ms. Huett filed suit in California state court in Los Angeles naming TWC as the sole defendant.  The Complaint alleges that TWC failed to supervise and control Harvey Weinstein with respect to his pattern and practice of sexual abuse and misconduct.

89.    Huett filed a First Amended Complaint on January 31, 2018, which added as defendants Harvey Weinstein and Bob Weinstein.  The Amended Complaint includes many of

the same factual allegations as the original complaint, but asserts a single cause of action for violation of the Federal sex-trafficking statute against Harvey Weinstein.

90.     Specifically, Ms. Huett alleges as follows:

12.   Plaintiff and Weinstein initially met at the bar of The Peninsula hotel, where they discussed Weinstein's interest in assisting Plaintiff with her acting career. During their conversation, Plaintiff noticed Weinstein staring at her breasts. Weinstein asked Plaintiff if she had ever had a "boob job" and asked her to show him her breasts. Plaintiff refused and was made uncomfortable by the question and the request. However, Weinstein informed Plaintiff that the purpose of the questioning      was that it would be beneficial for securing future roles if she did not have breast      augmentation.

13.   At some point during their conversation, Weinstein, who was at the time living at the hotel, invited Plaintiff to his room under the guise of continuing their business meeting. Plaintiff agreed to move the meeting to his hotel room, believing they were to continue their discussion regarding her career.

14.   While in Weinstein's room, the two continued their conversation regarding Plaintiffs career.  At some point, Weinstein excused himself to use the restroom. After several minutes, Weinstein returned from the restroom wearing only a bathrobe.

15.   Upon returning, Weinstein asked Plaintiff to perform a massage on him. Plaintiff said, "No," and that she did not feel comfortable by his request. However, Weinstein persisted and would not take "no" for an answer. Weinstein laid on the bed and demanded that Plaintiff perform a massage on him. Plaintiff ultimately complied with his demands and performed the massage.

16.   Subsequently, Weinstein requested to perform oral sex on Plaintiff. Plaintiff was shocked and alarmed by the request and initially refused. Again, Weinstein displayed persistence and would not take "no" for an answer. Weinstein initiated and Plaintiff froze as Weinstein removed her clothing and performed oral sex on her. Weinstein performed oral sex on Plaintiff for several minutes. After performing oral sex on Plaintiff, Weinstein masturbated in front of Plaintiff until he reached      orgasm.

## **CHUBB'S COVERAGE POSITION**

91.     Harvey Weinstein, through his attorneys, notified Chubb on various dates, of the Underlying Lawsuits and requested that Chubb provide a defense and indemnity under its policies.

92.     Chubb issued letters to Harvey Weinstein which disclaimed that it had any obligation to defend or indemnify Harvey Weinstein in the sexual assault Underlying Lawsuits under any of the policies identified herein for various reasons, as follows.

93.     The insuring agreement of the personal liability coverage (which is the only coverage part of the policies that is potentially applicable to these matters) is triggered only by damages for "personal injury" which takes place "during the policy period and are caused by an occurrence." The sexual assaults and injuries alleged by the plaintiffs took place on discrete times, on various dates. Chubb advised that coverage is not triggered under any policy that was not in effect at the time any of the plaintiffs' injuries took place because the insuring agreement of those policies is not satisfied.

94.     The policies define an "occurrence" in whole or part as an "accident" or as an "accident or offense." The Underlying Lawsuits allege that the claimed damages arose out of Mr. Weinstein's ongoing and pervasive, and allegedly criminal, acts of premeditated, forcible, non-consensual sexual and physical assault, physical threats and abuse in the context of Weinstein's invitation to his victims to discuss potential acting or producing roles in the film industry. Chubb advised Mr. Weinstein that such egregious, intentional acts by Mr. Weinstein do not constitute an "accident" or an "offense." Chubb therefore denied coverage for the Underlying Lawsuits on the basis that the damages were not caused by an "accident," "offense," or "occurrence," and therefore the personal liability coverage is not triggered.

95.     Every policy at issue in this action includes an "Intentional acts" exclusion. The damages alleged in the Underlying Lawsuits arose out of pre-meditated, forcible sexual assault, pervasive and egregious sexual harassment, physical assault and battery and other intentional and deliberate conduct by Mr. Weinstein. Mr. Weinstein's acts were such that the consequences

could and should have been foreseen by a reasonable person. Accordingly, Chubb declined coverage under the policies because the exclusion for "Intentional acts" applies to bar coverage.

96.     Many of the policies at issue in this action include a "Molestation, misconduct or abuse" exclusion. Here, the allegations of the Underlying Lawsuits are that Mr. Weinstein sexually assaulted and harassed the victims. Because the sexual assault, harassment and misconduct allegations of the Underlying Lawsuits arise out of conduct falling within the exclusion for "Molestation, misconduct or abuse," Chubb denied coverage based on this exclusion.

97.     Chubb also stated that, to the extent that any of the policies may be governed by California law (which Chubb disputes because the policies are governed by New York law), Section 533 of California's Insurance Code provides "An insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." California law establishes that Section 533 precludes coverage for claims of sexual assault. Accordingly, Chubb took the position that, to the extent any of the policies is governed by California law, Section 533 of California's Insurance Code precludes coverage for the Underlying Lawsuits.

98.     New York public policy precludes insurance coverage for intentional wrongful acts including those that constitute rape or other criminal conduct, sexual assault, predatory conduct or sexual harassment or discrimination. Because Mr. Weinstein's conduct alleged in the Underlying Lawsuits falls within the conduct for which New York public policy precludes insurance coverage, Chubb advised Mr. Weinstein that insurance coverage under the policies was not available.

99.    All of the policies include exclusions for "Discrimination," "Director's Liability," and "Business Pursuits." The Underlying Lawsuits all allege that Mr. Weinstein was an officer and part owner of TWC and also allege that his predatory, harassing and discriminatory conduct was committed within the scope of his employment at and ownership of TWC. Chubb thus advised Mr. Weinstein that coverage for the Underlying Lawsuits is or may be barred by the "Discrimination," "Director's Liability," and "Business Pursuits" exclusions.

100.    Weinstein, through his attorneys, directed a letter to Chubb dated February 22, 2018, which challenged Chubb's declination of coverage position for the *Doe* lawsuit filed in California state court and requested that Chubb withdraw its position and agree to defend Weinstein in that suit.

101.    Accordingly, a justiciable controversy exists between Chubb and Weinstein as to Chubb's coverage obligations under its policies for the Underlying Lawsuits.

## COUNT I

### (Declaratory Judgment – The Insuring Agreement Of The Personal Liability Coverage Of The Chubb Policies Is Not Triggered By The Underlying Lawsuits Because The Damages Do Not Arise Out Of An Occurrence)

102.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

103.    The insuring agreement of the personal liability coverage of the Chubb policies is triggered only by damages for "personal injury" which takes place "during the policy period and are caused by an occurrence."

104.    The policies define the term "occurrence" as either an "accident" or an "accident or offense."

105.    The Underlying Lawsuits allege that the damages arose out of premeditated, intentional acts by Mr. Weinstein that constituted forcible, non-consensual sexual and physical assault, sexual harassment and sexual misconduct.

106.    Mr. Weinstein's actions were intentional and deliberate and do not constitute either an "accident" or an "offense."

107.    The insuring agreement of the personal liability coverage of the Chubb policies is not triggered by the Underlying Lawsuits, because those matters do not allege "personal injury … caused by an occurrence" as defined in the policies.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that the personal liability coverage of the Chubb policies is not triggered by the Underlying Lawsuits because the alleged injuries do not arise out of an "accident," "offense," or "occurrence," and therefore, Chubb does not owe any defense or indemnity obligations under the policies for the Underlying Lawsuits.

## COUNT II

### (Declaratory Judgment – The Insuring Agreement Of The Personal Liability Coverage Of Any Policy Not In Effect At The Time Of A Plaintiff's Injury Is Not Triggered)

108.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

109.    The insuring agreement of the personal liability coverage of the Chubb policies is triggered only by damages for "personal injury" which takes place "during the policy period and are caused by an occurrence."

110.    The Underlying Lawsuits include specific allegations as to the discrete date or dates of injuries allegedly suffered by the plaintiffs.

111.    Any of the Chubb policies that were not in effect at the time any of the injuries described in the Underlying Lawsuits took place are not implicated by those matters and there is no potential for coverage under those policies because the insuring agreement of the personal liability coverage of the Chubb policies is not triggered.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that any Chubb policies not in effect on the date of the alleged injuries of any of the plaintiffs in the Underlying Lawsuits are not triggered and Chubb does not owe any defense or indemnity obligations under those policies for those Underlying Lawsuits.

## COUNT III

### (Declaratory Judgment – Defense and Indemnity Coverage For the Underlying Lawsuits Is Precluded Under The Policies By The Intentional Acts Exclusion)

112.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

113.    The personal liability section of all of the policies includes an "Intentional acts" exclusion which generally bars coverage for "damages arising out of a willful, malicious, fraudulent or dishonest act or any act intended by any covered person to cause personal injury or property damage. … An intentional act is one whose consequences could have been foreseen by a reasonable person."

114.    The plaintiffs in the Underlying Lawsuits allege that their damages arose out of pre-meditated, forcible sexual assault, pervasive and egregious sexual harassment, physical assault and battery and other intentional and deliberate conduct by Mr. Weinstein. The allegations of the lawsuits are that Weinstein intended that his acts would cause personal injury and/or Weinstein's acts were such that the consequences could and should have been foreseen by a reasonable person.

115.    Accordingly, the "Intentional act" exclusion in all of the Chubb policies bars both defense and indemnity coverage for the Underlying Lawsuits.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is excluded by the "Intentional act" exclusion.

### COUNT IV

### (Declaratory Judgment – Defense and Indemnity Coverage Is Precluded Under Certain Policies By The Sexual Molestation Exclusion)

116.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

117.    Policy Nos. 11248462-02, 12771390-02, 12771390-05, 14451500-01, 14307054-01, 14307054-02 all include an exclusion for "Molestation, misconduct or abuse," which bars

31

FILED: NEW YORK COUNTY CLERK 02/28/2018 03:29 PM
NYSCEF DOC. NO. 2    Case 1:18-cv-02526    Document 1-1    Filed 03/21/18    Page 33 of 38    INDEX NO. 650952/2018

RECEIVED NYSCEF: 02/28/2018

coverage for "damages arising out of any actual, alleged or threatened: sexual molestation; sexual misconduct or harassment; or abuse."

118.    The plaintiffs in the Underlying Lawsuits allege that their damages arose out of sexual assault and battery, sexual molestation, sexual misconduct or harassment or abuse.

119.    Accordingly, the "Molestation, misconduct or abuse" exclusion in the Chubb Policy Nos. 11248462-02, 12771390-02, 12771390-05, 14451500-01, 14307054-01, 14307054-02 bars both defense and indemnity coverage under those policies for the Underlying Lawsuits.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is excluded under Policy Nos. 11248462-02, 12771390-02, 12771390-05, 14451500-01, 14307054-01, 14307054-02 by the "Molestation, misconduct or abuse" exclusion.

## COUNT V

### (Declaratory Judgment – Defense and Indemnity Coverage Is Precluded Under The Policies By The Director's Liability Exclusion

120.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

121.    The personal liability section of all of the policies includes a "Director's liability" exclusion which generally bars coverage for "any damages for any covered person's actions or failure to act as an officer or member of a board of directors of any corporation or organization."

122.    The Underlying Lawsuits all allege that Mr. Weinstein was an officer of TWC at the time of the misconduct at issue, and also allege that Weinstein's conduct was committed within the scope of his employment at TWC and was ratified by TWC.

123.    Accordingly, the "Director's liability" exclusion in all of the Chubb policies bars both defense and indemnity coverage for the Underlying Lawsuits.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is excluded by the "Director's liability" exclusion.

## COUNT VI

### (Declaratory Judgment – Defense and Indemnity Coverage Is Precluded Under The Policies By The Business Pursuits Exclusion)

124.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

125.    The personal liability section of all of the policies includes a "Business pursuits" exclusion which generally bars coverage for "any damages arising out of a covered person's business pursuits, investment or other for-profit-activities, any of which are conducted on behalf of a covered person or others, or business property."

126.    The Underlying Lawsuits all allege that Mr. Weinstein was an officer of TWC at the time of the misconduct at issue, and also allege that Weinstein's conduct was committed within the course and scope of his employment at TWC and during the time he was a part owner of TWC.

127.    Accordingly, the "Business pursuits" exclusion in all of the Chubb policies bars both defense and indemnity coverage for the Underlying Lawsuits.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is excluded by the "Business pursuits" exclusion.

33

## COUNT VII

### (Declaratory Judgment – Defense and Indemnity Coverage Is Precluded Under The Policies By The Discrimination Exclusion)

128.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

129.    The personal liability section of all of the policies includes a "Discrimination" exclusion which generally bars coverage for "any damages arising out of discrimination due to age, race, color, sex, creed, national origin, sexual harassment, or any other discrimination."

130.    The Underlying Lawsuits all allege that Mr. Weinstein engaged in unlawful sexual harassment and discrimination, including hostile work environment and quid pro quo.

131.    Accordingly, the "Discrimination" exclusion in all of the Chubb policies bars both defense and indemnity coverage for the Underlying Lawsuits.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is excluded by the "Discrimination" exclusion.

## COUNT VIII

### (Declaratory Judgment –Coverage Is Precluded By Public Policy)

132.    Chubb realleges and incorporates by reference the allegations in paragraphs 1 to 101 of this Complaint.

133.    The public policy of the state of New York prohibits insurance coverage for injuries caused by willful acts of sexual assault, sexual harassment, sexual discrimination and/or other sexual misconduct.

134.    The alleged conduct in the Underlying Lawsuits constitutes willful acts of sexual assault, sexual harassment, sexual discrimination and/or other sexual misconduct.

135.    Thus, the public policy of the state of New York prohibits insurance coverage for the Underlying Lawsuits.

WHEREFORE, Chubb prays that this Honorable Court enter a judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is precluded by public policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Chubb prays that this Honorable Court order, adjudge, and decree the following relief:

a.    A judicial declaration that the personal liability coverage of the Chubb policies is not triggered by the Underlying Lawsuits because the alleged injuries do not arise out of an "accident," "offense," or "occurrence;"

b.    A judicial declaration that there is no coverage under any Chubb policy not in effect on the date of the alleged injuries of any of the plaintiffs in the Underlying Lawsuits because the insuring agreements of the personal liability coverage of those policies are not triggered;

c.    A judicial declaration that there is no coverage for either defense or indemnity for the Underlying Lawsuits because coverage is precluded by the "Intentional act" exclusion;

d.    A judicial declaration that there is no coverage for defense and indemnity for the Underlying Lawsuits under Policy Nos. 11248462-02, 12771390-02, 12771390-05, 14451500-01, 14307054-01, 14307054-02 because coverage is precluded by the "Molestation, misconduct or abuse" exclusion;

e.    A judicial declaration that there is no coverage for either defense or indemnity for the Underlying Lawsuits because coverage is precluded by the "Director's liability" exclusion;

f.    A judicial declaration that there is no coverage for either defense or indemnity for the Underlying Lawsuits because coverage is precluded by the "Business pursuits" exclusion;

g.    A judicial declaration that there is no coverage for either defense or indemnity for the Underlying Lawsuits because coverage is precluded by the "Discrimination" exclusion;

h.    A judicial declaration that defense and indemnity coverage for the Underlying Lawsuits is precluded by public policy;

35

i.      Award Chubb its costs, attorney's fees, and such other relief as the Court deems just and necessary.

Dated: New York, New York
February 28, 2018

CLYDE & CO US LLP

By: _____
Paul R. Koepff
Harris R. Wiener
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 710-3900

WALKER WILCOX MATOUSEK LLP
Edward P. Gibbons [to be admitted pro hac vice]
Joyce F. Noyes [to be admitted pro hac vice]
One North Franklin Street
Suite 3200
Chicago, Illinois 60606
(312) 244-6700

*Attorneys for Plaintiffs*

36

## APPENDIX A – CHUBB'S POLICIES

| POLICY NO. | TYPE | EFFECTIVE |
|---|---|---|
| 10067521-05 | Primary | 1/23/04-1/23/07 |
| 10067521-06 | Primary | 6/8/05-8/15/05 |
| 10067521-08 | Excess | 2/10/04-6/17/05 |
| 11248462-02 | Primary | 11/15/94-11/15/05 |
| 11248462-05 | Excess | 1/20/99-1/20/06 |
| 12771390-01 | Primary | 7/29/04-12/7/07 |
| 12771390-02 | Primary | 8/8/05-12/4/17 |
| 12771390-04 | Excess | 1/21/06-1/21/08 |
| 12771390-05 | Primary | 10/3/07-12/4/17 |
| 12771390-07 | Excess | 11/28/07-12/28/07 |
| 12771390-08 | Excess | 12/28/07-12/28/17 |
| 12771390-11 | Primary | 4/30/14-12/4/17 |
| 14307054-01 | Primary | 12/5/14-12/4/17 |
| 14307054-02 | Primary | 3/31/15-12/4/17 |
| 14451500-01 | Primary | 11/10/15-12/4/17 |
| 7951-14-77 DTW | Excess | 1/21/00-1/21/06 |

37